Miles F. McDonald, J.
Plaintiff institutes this action both as an individual and as trustee under the last will and testament of his deceased father, Frederic D. Foss, who at the time of his death on June 17, 1954, was the holder of 121 shares of the second preferred stock and 245 shares of the common stock of Foss, Halloran, Narr, Inc., the remaining 76% of both common and preferred being held by Harry R Halloran and Frederick W. Narr.
Mr. Foss in his lifetime was president of the defendant corporation and actively engaged in the corporate business as general manager thereof. The corporation was engaged in the business of general contracting, specializing in large construction projects both for the United States Government and for individuals. Prior to the death of the decedent, certified public accountants employed by the corporation had prepared statements showing the financial condition of the company as of March 31, 1954 as well as a profit and loss statement for the fiscal year ending that date which showed that the corporation had a net worth of $347,251.24, the preferred stock of the plaintiff being valued at $100 a share or $12,100, and the common stock of $293.25 per share, the plaintiff’s holdings in the common stock being valued approximately at $71,846, and total valuation of his stock approximately $83,946. The total assets of the corporation amounted to $668,370, of which $40,490.91 was for *115 plant and equipment, furniture, storage yard and small amounts for deposits and prepaid expenses. The balance of $627,879.76 consisted of:
Cash in banks and accounts receivable..............$154,834.77
Uncompleted Contracts —
Open Account
Retained Percentages Receivable ............. 354,026.83
Miscellaneous Receivable Items .................. 601.72
Inventory of Work-in-Process.................... 60,824.74
Claim Receivable for Refund of Federal Income Tax 57,591.70
This last item was approximately 8% of the total assets of the company and one seventh of the company’s net worth. There is not and never has been any dispute between the parties with respect to the correctness of this financial statement or of the company’s books, all parties agreeing that they fairly and accurately represent the company’s financial position. The item of $57,591.70 “ Claim Receivable for Refund of Federal Income Tax ” was in fact what is known as a carry-back adjustment under section 3780 of the Internal Revenue Code of 1939 (U. S. Code [1952 ed.], tit. 26, § 3780), and was based upon losses sustained by the company in the fiscal year commencing April 1,1953 and ended March 31,1954. A claim for such refund was filed on behalf of the company on June 24, 1954 with the Director of Internal Revenue in Brooklyn, New York.
On or about the month of July, 1954 the plaintiff, acting both individually and in his fiduciary capacity, entered into negotiations with the remaining stockholders Halloran and Narr and the defendant corporation for the sale to them of all of the stock previously owned by his deceased father. A preliminary offer was made by the defendant in the sum of $50,000, which was rejected by the plaintiff who demanded the sum of $125,000 for the interests which he represented. Negotiations continued up to and including the month of November, 1954. During this period and on or about August 9, 1954, the certified public accountants furnished all parties with a statement of the financial condition of the company as of June 30, 1954 setting forth the results of the company’s operations for the three months ending June 30,1954. The statement of operations indicated a net operating loss for the period of $49,353.89 against which there was credited an income tax refund on carry-back credit for the three-month period of $13,978.74, leaving a net loss for the period of $35,375.15. The balance sheet of the company as of that date showed a net worth of $311,876.09, slightly less than the amount shown as of March 30. The assets of the *116 corporation again consisted of cash in banks, accounts receivable, miscellaneous receivable items including “ Claim Receivable Refund for Federal Income Tax ” in the sum of $71,570.44 which represented the carry-back item contained in the previous report of $57,591.70 and the estimated carry-back for the three-month period of $13,978.74. The various adjustments during this period made no substantial change in the net worth of the company or in the book value of the plaintiff’s holdings of approximately $83,000. After the receipt of these financial statements, negotiations between the parties continued and a tentative agreement was reached in the month of November, 1954, the agreed price for the stock holdings of the plaintiff’s testator being fixed at the sum of $100,000, and a draft of an agreement to be entered into between the parties was prepared by the attorneys for the purchasers and delivered to the attorney for the seller. Said proposed agreement provided for the payment of $100,000, $25,000 upon the execution of the agreement; $25,000 one year from date; $25,000 two years from date and $25,000 three years from date, with interest at 6% upon unpaid balances of the purchase price. The draft agreement contained the following provision: ‘ ‘ The parties have made this agreement and the purchase price has been determined between them upon the assumption that all Federal, State and City governmental taxes and tax liabilities of every kind up to March 31st, 1954 have been fully paid and discharged. In the event that it shall be hereafter determined that the corporation is liable to any governmental body on account of any tax deficiency determined for any period prior to March 31, 1954, the seller shall be liable for-percent of the amount of any such determined tax deficiency together with interest penalties and costs. In the event there shall be no claim for additional taxes asserted against the corporation for any period up to March 31st, 1954, the corporation shall notify the seller of such claim. In the event that there shall be a dispute between the purchaser and the seller as to whether any such additional taxes shall be paid, the parties agree to promptly refer the decision of the matter to a Certified Public Accountant to be mutually agreed upon between them and the decision of such accountant as to whether such tax shall be paid or resisted shall be final and binding upon the parties.”
After conferences between the attorneys for the respective parties, the proposed agreement was abandoned and another proposed draft of an agreement was prepared, this time by the attorney for the sellers. In the second proposed agreement the details with respect to payment remained approximately the *117 same, but the provision with respect to the payment of taxes was modified to read as follows: “ 3. The purchase price has been determined by the parties hereto upon the assumption that any and all taxes due from the Corporation to the Federal or any State or City government for any period prior to and inclusive of the Corporation’s fiscal year ending as of March 31, 1954, have been fully paid and discharged. In the event that there shall be any claim for additional taxes asserted against the Corporation by any governmental agency for any prior fiscal period inclusive of the fiscal year ending March 31, 1954, the Corporation shall notify foss of such claim within ten days, from its receipt of notice of such claim. In the event that the Corporation and foss do not agree as to the advisability of resisting such claim the party who elects to so resist such claim shall do so at its own cost and expense and shall be solely responsible for the payment of any additional interest that may thereafter accrue and become ultimately due and payable. In the event that foss makes such election the Corporation agrees to allow foss to resist such claim in the name of the Corporation and further agrees to cooperate in every reasonable manner with foss’ efforts in connection with the same. In the event that the Corporation actually pays to any governmental agency any tax deficiency for any period prior to and inclusive of the fiscal year ending March 31, 1954, foss shall be liable to the Corporation for -% of the net amount actually paid, provided that such tax deficiency assessment arose solely as the result of the disallowance by the interested governmental agency of deductions taken by the Corporation in its tax report for the period in question and provided further that foss shall have received the notice hereinabove provided for. Any liability incurred by foss by reason of the provisions of this paragraph shall be applied in reduction of the last installment of purchase price due to foss from the Corporation. -% of any refund of taxes paid by the Corporation for any period prior to and inclusive of the fiscal year ending March 31, 1954, actually received by the Corporation shall be paid to foss. Such payment shall be made in conjunction with the payment of the last installment of purchase price to be made by the Corporation. Interest upon the unpaid balance of the purchase price shall be adjusted accordingly in the event that the last installment of the purchase price is either increased or decreased by reason of the provisions of this paragraph. If after the payment of the entire purchase price any sum shall become due to either foss or the Corporation by reason of the provisions of this paragraph, said sum shail be paid by the party liable therefor within 60 *118 days after the payment of such tax deficiency or the receipt of such tax refund, as the case may be.”
Objections were raised to the proposed agreement by the prospective purchasers and negotiations were continued further until the 12th day of January, 1955, when the agreement, the subject of this action, was entered into between the parties. The purchase price was $100,000, the terms of payment were the same, and provision with respect to the payment of taxes was as follows: “ 3. The purchase price has been determined by the parties hereto upon the assumption that any and all taxes due from the Corporation to thé Federal or any State or City government for any period prior to and inclusive of the Corporation’s fiscal year ending as of March 31, 1954, have been fully paid and discharged. In the event that there shall be any claim for additional taxes asserted against the Corporation by any governmental agency for any prior fiscal period inclusive of the fiscal year ending March 31, 1954, the Corporation shall notify foss of such claim within ten days from its receipt of notice of such claim. In the event that the Corporation and foss do not agree as to the advisability of resisting such claim the party who elects to so resist such claim shall do so at the cost and expense of such party and shall be solely responsible for the payment of any additional taxes and interest and penalties that may thereafter accrue and become ultimately due and payable. In the event that foss makes such election the Corporation agrees to allow foss to resist such claim in the name of the Corporation and further agrees to cooperate in every reasonable manner with foss’ efforts in connection with the same. In the event that the Corporation actually pays to any governmental agency any tax deficiency for any period prior to and inclusive of the fiscal year ending March 31, 1954, foss shall be liable to the Corporation for 24% of the net amount actually paid, provided that such tax deficiency assessment arose solely as the result of the disallowance by the interested governmental agency of deductions taken by the Corporation in its tax report for the period in question or for reallocation of income on work completed prior to March 31, 1954 and provided further that foss shall have received the notice hereinabove provided for. Any liability incurred by foss by reason of the provisions of this paragraph shall be applied in reduction of the last installment of purchase price due to foss from the Corporation. 24% of any net refund of taxes paid by the Corporation for any period prior to and inclusive of the fiscal year ending March 31, 1954, actually received by the Corporation shall be paid to foss. Such payment shall be made in conjunction with the payment of the *119 last installment of purchase price to be made by the Corporation. Interest upon the unpaid balance of the purchase price shall be adjusted accordingly in the event that the last installment of the purchase price is either increased or decreased by reason of the provisions of this paragraph. If after the payment of the entire purchase price any sum shall become due to either ross or the Corporation by reason of the provisions of this paragraph, said sum shall be paid by the party liable therefor within sixty days after the payment of such tax deficiency or the receipt of such tax refund. Foss or his representatives shall be permitted to examine the books and records of the Corporation for the purpose of determining whether any additional tax claims are warranted or whether any refunds of taxes are due to the Corporation. Foss agrees to exercise this right in a reasonable manner so as to not unduly interfere with the normal business affairs of the Corporation.”
The financial statement as of September 30, 1954 referred to in the agreement showed the corporation having a net worth of $314,131.75. The items contained therein were in most respects similar to those contained in the previous report, with the following important exception: The Claim Receivable for Refund for Federal Income Tax had been reduced from $71,570.44 to $13,978.74. This reduction was due to payment by the Government of the tax loss carry-back of approximately $57,591.70 shown in that amount on the statement of March 31, 1954, which constituted a portion of the claimed refund of $71,570.44 shown as of June 30, 1954. Simultaneously with the execution of the agreement, the various certificates were delivered as required, the first installment of the purchase price was paid and the parties separated. Nothing further occurred with respect to the agreement or the performance thereof by the parties, and the payments required to be made pursuant thereto were duly made. As far as the record indicates there was no communication between the parties of any consequence. At no time did the plaintiff or his attorney seek any information from the defendant to determine the status of the claim for carry-back for either of the years in question or express any interest therein, until the time of the last payment.
Subsequent to the execution of the agreement and after the completion of the taxable year ending March 31, 1955, the defendant company filed another claim for a carry-back adjustment in the sum of $29,433.79 based upon losses sustained in that year in the sum of $125,389.
• The plaintiff now brings this action claiming that the carry-back adjustments for the years ending March 31, 1953 and *120 March 31, 1954 amounting to $85,542.06 are “ refunds ” and that he, by virtue of the terms of paragraph ‘ ‘ 3 ” of the contract, is entitled to 24% thereof or $20,530.09; that payment thereof has been demanded and refused.
Defendant, on the other hand, contends that the tax carry-backs are not in truth and in fact refunds as that term is used in the contract but were assets of the company contained in its balance sheet either accurately or in approximation of the time of the closing of the contract and constituted a corporate asset upon which the purchase price paid to the plaintiff was based.
The answer of the defendant herein in addition to a denial of the plaintiff’s claim, contains a counterclaim seeking reformation of the contract. In support of this claim of the defendant, testimony was offered for the purpose of showing the intent of the parties. The counterclaim for reformation of the contract was dismissed by the court at the close of the defendant’s case, and all testimony and conversations of the parties and their attorneys prior to the execution of the contract have been disregarded by the court in arriving at its determination herein. However, the court in arriving at a construction of the contract must consider the factual situation which existed at the time of the negotiations and execution thereof which prompted the execution of the contract as well as the conduct of the parties subsequent to the execution thereof which would indicate the construction they themselves placed upon the contract and their interests therein (Utica City Nat. Bank v. Gunn, 222 N. Y. 204).
In Nash v. Gay Apparel Corp. (9 A D 2d 345, 347, 348), the court stated:
“ Decision on this appeal turns on the use of words in a written contract, words which may be read in one sense the way plaintiff reads them and in a literal sense the way defendant reads them. An evaluation must be made as a basis for a declaratory judgment of what was intended to be expressed when the words were set down, to be adduced both from the total contractual language and from the circumstances and practices of the parties when they entered into the formal writing.
.y. vy. «V. Sv w w
‘ ‘ This is the rule where the 1 language alone ’ is of ‘ doubtful import ’ (Morris v. Sickly, 133 N. Y. 456, 459). In every interpretation of written language the process involves ‘ association between words and external objects ’ (Kellogg, J., in Matter of Smith, 254 N. Y. 283, 289, approving Wigmore’s statement in Evidence, § 2470, subd. 3). The complete instrument with all its contextual meanings in ‘ the light of the obligation as a *121 whole ’ is the main guide to construction (Atwater & Co. v. Panama R. R. Co., 246 N Y. 519, 524).”
In Wirth & Hamid Fair Booking v. Wirth (265 N. Y. 214), the court stated at page 219: “ At times the language of a contract, read as a whole and in the light of the circumstances surrounding its execution, may disclose an intention which would be thwarted by a strict grammatical construction.”
In Rasmussen v. New York Life Ins. Co. (267 N. Y. 129, 132), the court stated: “ ‘ And even where the writing is not ambiguous on its face, the circumstances under which the parties contract may be looked at * * * to indicate the proper choice of possible meanings; and the common knowledge and the understanding of the parties * * * is sometimes such a circumstance. ’ (American Law Institute, Restatement of Contracts, § 242.) ”
The following facts are clearly established: That the book value of the stock of the plaintiff in the defendant corporation as of September 30, 1954 as set forth in the financial statement referred to in the contract, was $75,100, which reflected both the carry-back adjustment for the year ending March 31,1954, which had been paid, and the sum of $13,978.74, representing a tentative carry-back adjustment for the first six months of the fiscal year ending March 30, 1954, amounting approximately to $14,000. The $70,000 represented thereby constituted approximately one fifth of the capital and surplus of the company. It is impossible for the court to believe that it was within the contemplation of the parties that the plaintiff should be entitled to receive 25% thereof, in addition to the sum of $100,000 which was $25,000 in excess of his prorata share of the book value of the stock being sold. It is even more difficult to believe that if this were the intention of the parties, it would be referred to in such an oblique manner as is claimed by the plaintiff. Certainly, both parties knew that they were carry-backs and the approximate amount thereof was known, and it was equally obvious to all concerned, that they represented a substantial portion of the corporate assets which contributed to the intrinsic value of the plaintiff’s stock. If it were the intention of the parties that the plaintiff was entitled to receive an additional payment based upon these known factors, it certainly would have been so expressed in the contract rather than hypothetically by the words 11 In the event there shall he any claim for additional taxes ’ ’ etc. As part of this paragraph, there is the further provision that 24% of any net refund of taxes paid by the corporation for any period prior to and inclusive of the fiscal year ending March 31,1954, actually received by the corporation *122 shall be paid to Foss. It is quite clear from a reading of the paragraph that these provisions were to cover contingencies which were not known, and which could not otherwise be provided for, and were not intended to be an agreement to pay the seller 24% of the tax carry-back for the year ending March 31, 1953, which had not only been determined, but had actually been paid and was an asset of the corporation as aforesaid. To place any other construction upon the contract we would be required to believe that the parties at the time knew that the seller was to be entitled to receive an additional $12,000, as a minimum extra payment, a substantial increase in the purchase price, without any direct reference thereto.
It is quite clear that what was intended by the parties was that the term “ refund ” was used in its true sense.
In Black’s Law Dictionary the word “ refund ” is defined as ‘ ‘ to repay or restore; to return money had by one party of another. ’ ’
In Words and Phrases (Perm, ed., vol. 36, p. 627) “ refund ” is defined as “to give back; to restore; to repay. ’ ’
In State ex rel. Sidenfaden v. United States Fid. & Guar. Co. (193 F. 2d 47, 50): “ The word ‘ refund ’ is defined, 1 To pay back by the party who has received it, to the party who has paid it, money which ought not to have been paid.’ City of Grand Rapids. v. Iosco Land Co., 273 Mich. 613, 263 N. W. 753, 755, 105 A. L. R. 695; Daniel v. Richcreek, Tex. Civ. App., 118 S. W. 2d 935, 937; The Cyclopedic Law Dictionary (3rd edition, 1940).”
In Becker v. Frasse & Co. (255 N. Y. 10), which closely resembles this case, the court at pages 13 and 14 stated:
“ The trial judge, construing the refund agreement in the light of the circumstances, held that the ‘ further refunds ’ there referred to did not include the payment of moneys upon a refund already allowed by the Government and treated by the corporation as a cash item, but must be confined to other refunds, the subject of claims then pending and undetermined.
# * *
“ The rule has often been declared that a contract is to be read in the light of the circumstances existing at its making, and that these may avail to stamp upon a word or phrase a loose or secondary meaning as distinguished from the strict or primary meaning to be gathered from the instrument unenlightened by extrinsic aids (Utica City Nat. Bank v. Gunn, 222 N. Y. 204, 208; Atwater & Co. v. Panama R. R. Co., 246 N. Y. 519, 524; Kenyon v. Knights Templar & M. M. A. Assn., 122 N. Y. 247; Lamb v. Norcross Bros. Co., 208 N. Y. 427).”
*123 In Troy Union R. R. Co. v. City of Troy (227 App. Div. 351, 354), the court stated: “ The agreement is to refund, that is, to pay back money which ought not to have been paid. (Definition of ‘ refund,’ Bouvier Law Dict. [Rawle’s 3d Rev.].) ”
In United States v. Walker-Hill Co. (79 F. Supp. 482, 485), the court stated: “A drawback under Section 3250 is not a refund in the ordinary, accepted and popular sense as used in the limitation section; it is not a return of money paid by the claimant for internal revenue tax, but is a grant of the right to a claim for money qualified on proof of compliance with conditions giving rise to such a right and is not limited to the taxpayer but is given to the user as well who pays a special and distinct tax for this privilege less in amount than the drawback would be. Consequently, it appears that there is nothing ‘ to pay back, return, restore, make restitution ’ to the defendant since no tax, other than the special tax not claimed to be refunded, was paid by the defendant.”
A tax carry-back is not in the true sense a refund, for the tax liability of the company for the year ending March 31, 1953 was not adjusted except in a minor manner, not in issue here. It was due when it was paid and the company was liable therefor. There were no errors for disallowance or alterations in the tax liability for that period. A tax carry-back is rather a means of mitigating the hardships which are inherent in our present tax structure, by which the Government attempts to minimize the hills and valleys of the economic road.
The fact that the plaintiff remained silent for a period of three years, evincing no interest in the tax carry-backs, is an eloquent indication that he did not consider that he had any interest therein. As he received annual statments of the corporation’s financial status, he must have noticed the changes in the listed assets referring to the carry-backs. In the absence of so substantial an item his interest therein would have prompted him to inquire as to why it was no longer carried in the corporate books, had it been paid, or had it been disallowed. The fact that he was not to receive a proportionate share until the final payment does not explain his lack of interest in so substantial an amount. It indicates clearly that he himself did not believe that he had such an interest. To hold otherwise would be to permit the plaintiff to both have his cake and eat it too. To place the construction upon the contract which is urged by the plaintiff, one would have to believe that the draftsman of the tax refund portion of the instrument who was the attorney for the plaintiff, deliberately intended to obscure the true intent of *124 the parties by concealing a 20% increase in the purchase price in the tax refund portion of the contract. The court is unwilling to believe that he was guilty of such deception.
Let the defendant have judgment accordingly.